UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JAMES ASHLEY BOWLING,     )
           )
    Plaintiff,       )
           )
v.           )    Case No. 5:20-cv-641-GMB
           )
SOCIAL SECURITY     )
ADMINISTRATION,     )
COMMISSIONER,      )
           )
    Defendant.     )

## MEMORANDUM OPINION

On August 27, 2018, Plaintiff James Ashley Bowling filed an application for a period of disability and disability insurance benefits. His alleged disability onset date is October 16, 2016. Bowling's application for benefits was denied at the initial administrative level. He then requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ held a hearing on June 5, 2019, and denied Bowling's claims on July 15, 2019. Bowling requested a review of the ALJ's decision by the Appeals Council, which declined review on March 16, 2020. As a result, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration (the "Commissioner") as of March 16, 2020.

Bowling's case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Under 28 U.S.C. § 636(c)(1) and Rule 73 of the Federal

Rules of Civil Procedure, the parties have consented to the full jurisdiction of a United States Magistrate Judge. Doc. 11. Based on a review of the parties' submissions, the relevant law, and the record as a whole, the court concludes that the decision of the Commissioner is due to be affirmed.

## I. STANDARD OF REVIEW[1]

The court reviews a Social Security appeal to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court will reverse the Commissioner's decision if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The court "may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner," but rather "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (citation and internal quotation marks omitted). "Even if the evidence preponderates against the Secretary's factual findings, [the court] must affirm if the decision reached is supported by substantial evidence."

---

[1] In general, the legal standards applied are the same whether a claimant seeks disability insurance benefits ("DIB") or Supplemental Security Income ("SSI"). However, separate parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to reference the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in excerpted court decisions.

*Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  Moreover, reversal is not warranted even if the court itself would have reached a result contrary to that of the factfinder. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

The substantial evidence standard is met "if a reasonable person would accept the evidence in the record as adequate to support the challenged conclusion." *Holladay v. Bowen*, 848 F.2d 1206, 1208 (11th Cir. 1988) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)).  The requisite evidentiary showing has been described as "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The court must scrutinize the entire record to determine the reasonableness of the decision reached and cannot "act as [an] automaton[] in reviewing the [Commissioner's] decision." *Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987).  Thus, the court must consider evidence both favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990).

The court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Grant v. Astrue*, 255 F. App'x 374, 375–76 (11th Cir. 2007) (citing *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994)).  There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Bowling bears the burden of proving that he is disabled and must produce evidence sufficient to support his claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

A determination of disability under the Social Security Act requires a five-step analysis. 20 C.F.R. § 404.1520(a). The Commissioner must determine in sequence:

(1) Is the claimant presently unable to engage in substantial gainful activity?
(2) Are the claimant's impairments severe?
(3) Do the claimant's impairments satisfy or medically equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the claimant unable to perform her former occupation?
(5) Is the claimant unable to perform other work given her residual functional capacity, age, education, and work experience?

*See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015).

"An affirmative answer to any of the above questions leads either to the next

question, or, [at] steps three and five, to a finding of disability. A negative answer to any question, other than at step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (quoting 20 C.F.R. § 416.920(a)−(f)). "Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir. 1985)).

Applying the sequential evaluation process, the ALJ found Bowling had not engaged in substantial gainful activity since his alleged onset date of October 16, 2016. R. 12. At step two, the ALJ found Bowling suffered from the following severe impairments: post-concussion syndrome, migraines, degenerative disc disease of the cervical spine, degenerative joint disease of the right shoulder and right knee, obesity, posttraumatic stress disorder ("PTSD"), and generalized anxiety disorder ("GAD"). R. 12.

At step three, the ALJ found Bowling did not have an impairment or combination of impairments meeting or medically equaling the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 13. Before proceeding to step four, the ALJ determined Bowling had the Residual Functional Capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b),

> except he can never climb ladders, ropes, or scaffolds; he can frequently balance and climb ramps and stairs; he can occasionally stoop, kneel,

crouch, and crawl; he must avoid concentrated exposure to unprotected heights or moving machinery; he can understand, remember, and carry out simple tasks; he can maintain concentration, persistence, or pace for those tasks in 2-hour periods with customary breaks spread throughout the workday; he can occasionally interact with supervisors, coworkers, and the public but will work better with things rather than people; and he can adapt to occasional changes in the workplace.

R. 14. In reaching this opinion, the ALJ stated that he considered Bowling's symptoms, the objective medical evidence, and other evidence. R. 14.

The ALJ determined Bowling was not able to perform any past relevant work. R. 19. The ALJ relied on the evidence of a Vocational Expert ("VE") to find that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 19. Thus, at step five of the five-step sequential process, the ALJ found Bowling not to be disabled since October 16, 2016, the alleged onset date, through July 15, 2019, the date of her decision. R. 20.

## III. RELEVANT FACTUAL BACKGROUND

### A. Bowling's Testimony

Bowling graduated from high school in 1999. R. 170. He began working for the Lawrence County Sheriff's Office as a Deputy in 1999. R. 37 & 170. His career ended when he suffered a head injury during a physical altercation at work on October 16, 2016. R. 170, 208 & 231. Bowling testified that he has rarely driven a car since his injury. R. 36. He suffers from post-concussion syndrome and PTSD.

R. 39.  His post-concussion syndrome causes him to fall a couple times a month. R. 39.  He also has ten to twelve migraines per month, each lasting two to three hours. R. 40.  When he has a migraine, Bowling has to sit in a dark room, alone, without being exposed to television or sound. R. 40.

Bowling testified that he also experiences pain from a bulging disc in his neck, a shoulder surgery, and his knee. R. 41.  He claims that the injuries to his shoulder and knee relate to the attack on October 16, 2016. R. 42.  He rates his pain overall as a six out of ten. R. 44.  When he is taking over-the-counter medication, his pain is at a four or five out of ten. R. 44.

During a typical day, Bowling wakes up at 6:00 to help his children get ready for school and see them off to the school bus. R. 44.  He sits in his chair until the children come home and then goes outside so that the bus driver can see that a parent is home and let the children off the bus. R. 45.  Bowling has to wear sunglasses and sit in the shade when he is outside. R. 45.  At the hearing, he testified that he does not do any household chores. R. 45.  Katherine Bowling, his wife, also testified at the hearing. R. 48.  She said that Bowling had been a bright, active person before his injury. R. 49.  Afterwards, he has been angry, sick, and in pain. R. 49.  She testified that she takes care of all of the household chores while Bowling spends his days in his recliner. R. 49–50.

Bowling testified that he goes to the gym but only to walk, and he often gets

dizzy even doing that. R. 52. He said he visits his wife's grandmother twice per week to sit in a recliner near her. R. 53. Bowling also testified that Ms. Lawson, his therapist, incorrectly recorded that he picks up his children from school and practices. R. 53–56. Bowling indicated that he is able to pay bills and count change but cannot handle a saving account or use a checkbook, noting that it is "hard to write, understand, frustrating." R. 227.

## B.   Bowling's Medical Records

On November 10, 2016, Dr. Stephen Howell saw Bowling and diagnosed him with a concussion and noted his significant dizziness, headache, and retrograde amnesia. R. 311 & 313. Dr. Howell also noted his knee and shoulder pain. R. 313. Dr. Howell observed that it would take months for Bowling to recover from the assault. R. 314. On December 17, 2016, Dr. Howell learned from Bowling and his wife that Bowling has significant memory deficits. R. 309.

On November 21, 2016, Dr. Chad McElroy saw Bowling and noted that he was experiencing dizziness, headaches, memory loss, and psychomotor slowing. R. 570–72. Bowling presented with similar symptoms to Dr. McElroy on February 20 and October 4, 2017. R. 578–85. After Bowling's shoulder surgery on April 4, 2017, he reported that his shoulder and knee pain had "tremendously improved" in a visit with Dr. McElroy on July 31, 2017. R. 733. Dr. McElroy's physical exam confirmed that Bowling had an excellent range of motion in his shoulder with "no

apparent discomfort." R. 733.  Bowling saw Dr. McElroy again on January 29, 2018, when Bowling reported some pain in his right knee and heel. R. 732.  Bowling had no swelling in his right knee and had satisfactory range of motion and no tenderness. R. 732.

On February 23, 2017, Dr. Stephen Howell noted that Bowling was alert but had definite concentration issues. R. 303.  On the same day, Stephen Boll, Ph.D., performed a psychological evaluation on Bowling. R. 318.  Based on the intellectual and background evaluation, Boll concluded that Bowling had always functioned "in the low average range." R. 319.  Boll also observed that Bowling is "very cognitively slow" but that his slowness was "really not proportional to what would be expected in someone who had a legitimate but nevertheless mild traumatic brain injury although it could represent the lingering residuals of something that occurred just three months ago and should therefore be subject to continuing improvement." R. 320.  Boll recommended that Bowling "engage in a number of activities of a work hardening nature that would be effective in getting him reconditioned and back into a much more active and appropriate regime." R. 320.

On March 8, 2017, Dr. Kyle Hudgens examined Bowling. R. 778.  Dr. Hudgens noted that Bowling experienced depression but no mood swings, suicidal thoughts, nervousness or anxiety; no panicky feelings; and no unusual experiences. R. 779.  Bowling reported no muscle weakness or joint pain. R. 779.  Dr. Hudgens

noted that he was alert with normal mental status and that he could move his extremities well and had normal station and gait. R. 779. On April 12, 2017, Dr. Hudgens saw Bowling again and observed that he was trying to walk but had undergone right shoulder surgery, and mentioned that he "has a brighter look about him and is more interactive." R. 781. On June 14, 2017, Dr. Hudgens noted that Bowling was not functioning as well after his shoulder surgery. R. 783. Dr. Hudgens told Bowling to taper off his caffeine intake and begin a walking program. R. 783. On July 26, 2017, Bowling reported that he was not walking for exercise and had not cut down on his caffeine. R. 785.

On August 24, 2017, Dr. Hudgens treated Bowling for "follow-up postconcussion syndrome." R. 787. Dr. Hudgens noted that he had previously signed papers indicating that Bowling could perform light duty under the assumption that light duty "would be a desk job handling reports." R. 787. Dr. Hudgens was not comfortable with Bowling performing light duty responsibilities when he learned that they include "handling complaints as they arise in the front office, handling reports, [and] serving warrants as needed." R. 787. He also noted that he would try to obtain a psychiatry consultation for Bowling. R. 787.

On November 1, 2017, Dr. Hudgens noted that Bowling had weaned himself from caffeine but had not been able to see a psychiatrist. R. 789. On June 28, 2018, Bowling told Dr. Hudgens that he was no longer exercising and was having

headaches three days per week. R. 791. Dr. Hudgens directed him to a website that demonstrates exercise routines. R. 791. On August 21, 2018, Bowling reported that he was doing better with respect to his headaches and depression and also was becoming more active. R. 793. Dr. Hudgens noted that he was "brighter and spontaneously interactive." R. 793. On December 5, 2018, Bowling reported to Dr. Hudgens that he was having migraines almost daily, so Dr. Hudgens prescribed Botox. R. 825. Dr. Drew Uhrig performed the Botox injections on January 9 and April 3, 2019. R. 826–31. On April 22, 2019, Dr. Hudgens signed a note indicating that Bowling's work limitations were "No work—No Light duty." R. 832.

On August 28, 2018, Dr. Stuart Tieszen examined Bowling. R. 797. He documented Bowling's diagnoses of PTSD, postconcussion syndrome with recurrent headaches, secondary major depression, GAD, panic disorder, and trauma to shoulder and knee. R. 797. Bowling denied any adverse side effects from his medication and reported that his appetite and sleep were improving even if his sleep continued to be disrupted. R. 797. Dr. Tieszen documented Bowling's and his wife's reports that Bowling gets up at 6:00 a.m. on an average day, dresses himself, and helps his wife in getting the kids to school. R. 798. They reported that he spends the day at home unless his kids have ballgames or programs. R. 798. He reported continued physical symptoms of PTSD such as nausea, vomiting, and diarrhea when he leaves the house. R. 798. Mrs. Bowling reported that Bowling's emotions were

erratic. R. 798. Dr. Tieszen observed that Bowling was cooperative, well-groomed, but "somewhat distant and disengaged." R. 798. He had coherent speech but "somewhat paucity of thought or communication." R. 798. Dr. Tieszen noted that Bowling's thought process and content were logical, organized, and goal-directed overall, "but he is distracted." R. 798. "Cognitively, he is alert and oriented. Memory is intact. Concentration is fair to poor. Insight and judgment are fair. Language is intact." R. 798–99.

Dr. Tieszen saw Bowling again on October 26, 2018. R. 816. On examination, Bowling presented similarly, but Dr. Tieszen noted that his concentration was fair and his insight and judgment were fair to good. R. 817. Dr. Tieszen also noted that Bowling did not seem to be progressing. R. 817. Bowling complained of dizzy spells. R. 817. On January 4, 2019, Dr. Tieszen again made similar observations but noted that "[t]he patient cognitively continues to have difficulty. He has light headaches and is in bed a lot and is taking many naps." R. 820. Bowling also reported that he no longer travels for his children's sports or activities and that he was under significant stress at work. R. 820. On March 1, 2019, Dr. Tieszen observed that Bowling was "obviously lighter and less depressed [and] much calmer." R. 822. His job stress had decreased. R. 822. Otherwise, his findings on examination continued to be similar. R. 822. On May 8, 2019, Dr. Tieszen completed a form indicating that Bowling had marked restrictions in activities of

daily living, moderate difficulty in maintaining social functioning, and marked limitations in a number of work-related skills. R. 856–58.

On November 11, 2018, Bowling saw Heather Lawson, a licensed counselor, who noted that he is engaged in activities of daily living including "self care/grooming/showering daily, helping around the house with cleaning, helped kids with cleaning/organizing their bedrooms." R. 837. On December 3, 2018, Lawson noted that she discussed the possibility of future employment with Bowling and that he was open to the idea. R. 839. On December 11, 2018, Lawson noted that Bowling's depression and anxiety had decreased. R. 841. On January 15, 2019, Lawson worked with Bowling to create a plan for weekly exercise. R. 843. On February 5, 2019, Bowling reported to Lawson that he had been active in helping to care for his and his wife's grandparents, including cleaning and doing laundry. R. 845. At night, he reported that uses his phone to play puzzle games. R. 845. On February 28, 2019, Bowling appeared to be doing well and reported to Lawson that he was taking primary caregiving responsibilities for his children and his in-laws because his wife was returning to work. R. 847.

On September 28, 2018, Dr. Robert Estock reviewed Bowling's medical record and observed that he had recent exam findings indicating that his gait was normal, that he had no tics, tremors, or abnormal movements, and that he had a satisfactory range of motion and no tenderness in his right knee. R. 68. He found

that Bowling had only moderate restrictions with respect to the "B" criteria of Listings 12.04 and 12.06. R. 69. Dr. Estock concluded that Bowling is highly functional based on the reported activities of daily living, despite his complaints of pain and psychiatric symptoms. R. 68. Dr. Gloria Sellman also reviewed Bowling's records on the same day and provided a residual functional capacity assessment that indicated he could perform light work with some additional limitations. R. 71–72.

## IV. DISCUSSION

Bowling raises three arguments for reversing the ALJ's decision: (1) the ALJ's consideration of the medical opinions was not supported by substantial evidence; (2) the ALJ did not properly credit Bowling's testimony as to the severity of his symptoms; and (3) Bowling meets Listings 12.04, 12.06, and 12.15. Doc. 15 at 43–66. The court addresses each of these arguments in turn.

## A. Medical Opinions

Bowling argues that the ALJ should have given more weight to the opinions of Dr. Hudgens and Dr. Tieszen and less weight to the opinions of Dr. Sellman and Dr. Estock. For claims filed after March 27, 2017, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Instead, the ALJ will consider several factors when weighing medical opinions:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to

support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative

medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

20 C.F.R. § 404.1520c(c).  Of these factors, supportability and consistency are the most important. 20 C.F.R. § 404.1520c(a).

Bowling argues that the opinions of Dr. Hudgens and Dr. Tieszen are supportable and consistent with the entire record. Doc. 15 at 43.  But substantial evidence supports the ALJ's finding that their opinions are not persuasive.  The ALJ found that Dr. Hudgens' opinion was not persuasive because it is "conclusory on the issue of disability and is not supported by the claimant's treatment history." R. 18.  Because Dr. Hudgens provided no explanation for his conclusion that Bowling should not work, his opinion lacks supportability. *See* 20 C.F.R. § 404.1520c(c)(1).  And Dr. Hudgens' opinion is inconsistent with his own treatment records.  In 2017, Dr. Hudgens indicated that he believed Bowling could perform "a desk job handling reports." R. 787.  Dr. Hudgens also repeatedly urged Bowling to begin and maintain an exercise regime. R. 783 & 791.  Finally, the regulations indicate that "[s]tatements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work" are "inherently neither valuable nor persuasive to the issue of whether you are disabled." 20 C.F.R. § 404.1520b(c).  Dr. Hudgens' conclusion was just such a statement.  Therefore, the court finds that there is substantial evidence supporting the ALJ's finding that Dr. Hudgens' opinion is not persuasive.

The ALJ also found that Dr. Tieszen's opinion was not persuasive because

(1) it was not supported by Bowling's treatment history, (2) the form Dr. Tieszen completed did not use appropriate vocational terms or criteria for assessing mental limitations, and (3) the limitations Dr. Tieszen indicated are inconsistent with Bowling's own reported activities. R. 18–19. Many of the boxes that Dr. Tieszen checked on the form indicate that Bowling has significant limitations in his ability to perform work-related activities (R. 856–58) and thus may run afoul of the regulations discussed above. *See* 20 C.F.R. § 404.1520b(c). Furthermore, there is substantial evidence supporting the ALJ's conclusion that Dr. Tieszen's opinions are inconsistent with the evidence. Bowling and his wife reported to Dr. Tieszen that Bowling performed daily activities like helping to prepare his children for school and attending their ballgames or programs, although he later stopped doing these activities. R. 798 & 820. And Bowling's symptoms have improved over time. R. 822. Additionally, Bowling reported daily activities to his counselor, Heather Lawson, that included cleaning, self-care, laundry, caring for his children and in-laws. R. 837 & 845–47. Lawson urged Bowling to exercise and even discussed the possibility of future employment with Bowling in December 2018. R. 841. Thus, there is substantial evidence supporting the ALJ's finding that Dr. Tieszen's opinions regarding Bowling's abilities are unpersuasive.

Bowling also argues that the opinions of Dr. Sellman and Dr. Estock lack support and consistency with the entire record such that the ALJ should have given

their opinions less credence because they are not treating physicians and only reviewed the record. Doc. 15 at 49. However, for claims filed after March 27, 2017, the ALJ is no longer required to give special deference to the opinion of a treating physician over and above that of a physician who merely reviews the record. *See* 20 C.F.R. § 404.1520c(a). Bowling also argues that the opinions of Dr. Sellman and Dr. Estock are unpersuasive because they do not consider evidence submitted after September 28, 2018, such as the information from Lawson, Dr. Hudgens, and Dr. Tieszen. Doc. 15 at 49–50. However, as discussed above, there is substantial evidence supporting the ALJ's decision to find the opinions of Dr. Hudgens and Dr. Tieszen unpersuasive. And, as also discussed above, the evidence from Lawson supports the opinions of Dr. Sellman and Dr. Estock that Bowling is capable of light work. For these reasons, the court finds that there is substantial evidence supporting the ALJ's conclusion that the opinions of Dr. Sellman and Dr. Estock are persuasive.

## B.    Pain Standard

The Social Security Regulations provide that a claimant's subjective complaints of pain alone cannot establish disability. Rather, the regulations describe additional objective evidence that permits a finding of disability. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529. Interpreting these regulations, the Eleventh Circuit has articulated a "pain standard" that applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms.

When establishing disability in this manner, a claimant must satisfy two parts of the Eleventh Circuit's three-part pain standard: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

"[I]f a claimant testifies to disabling pain and satisfies the three part pain standard, the ALJ must find a disability unless the ALJ properly discredits the claimant's testimony." *Crow v. Colvin*, 36 F. Supp. 3d 1255, 1259 (N.D. Ala. 2014). A claimant's testimony that is supported by medical evidence and satisfies the pain standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). But an ALJ is free to determine that a claimant's testimony is not credible. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005); *Crow*, 36 F. Supp. 3d at 1259. Thus, after the pain standard is satisfied, the "ALJ must make credibility determinations regarding a claimant's claims of pain" to determine whether the claimant truly is disabled. *Fries v. Comm'r of Soc. Sec. Admin.*, 196 F. App'x 827, 833 (11th Cir. 2006); *Crow*, 36 F. Supp. 3d at 1259.

When determining the credibility of a claimant's testimony about her symptoms, the ALJ must follow a two-step process: "(1) first determine if the claimant has a medically determinable impairment that could reasonably be expected

to produce the symptoms alleged; and, if so (2) evaluate the intensity and persistence of the claimant's symptoms such as pain and determine the extent to which the claimant's symptoms limit his or her ability to perform work-related activities." *Cooley v. Comm'r of Soc. Sec.*, 2019 WL 211437, at *2 (M.D. Fla. Jan. 16, 2019). "In considering the intensity, persistence, and limiting effects of the claimant's symptoms, the ALJ is to examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *3 (internal citation and quotation omitted). "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.2d at 1255. "The ALJ is not required explicitly to conduct a symptom analysis, but the reasons for his or her findings must be clear enough that they are obvious to a reviewing court." *Carrell v. Berryhill*, 2019 WL 1696698, at *4 (N.D. Ala. Apr. 17, 2019). Otherwise, the testimony will be accepted as true. *Id.* The pain standard requires substantial evidence supporting the articulated reasons. *Hale*, 831 F.2d at 1012 ("Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence."). In any event, the "question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r*

*of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

The ALJ found that Bowling's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 15. However, the ALJ also concluded that Bowling's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 15. Bowling argues that the ALJ's conclusion is contrary to the medical evidence and his own testimony. Doc. 15 at 53.

There is substantial evidence, however, supporting the ALJ's conclusion. Bowling testified that he experiences debilitating symptoms related to his post-concussion syndrome, PTSD, and neck and shoulder pain. R. 37–45. But his description of his symptoms does not align with all of the medical evidence. Specifically, Lawson recorded that Bowling was engaging in activities of daily living including grooming, cleaning the house, helping his children clean and organize their bedrooms, and cleaning and doing laundry for his wife's grandparents. R. 837 & 845. During his follow-up visits with Dr. McElroy, Bowling was observed to have no knee pain in 2017 and some pain in 2018 but with a satisfactory range of motion and no tenderness. R. 732–33. For these reasons, the court finds that there is substantial evidence supporting the ALJ's finding that Bowling's testimony regarding the severity of his pain is not entirely consistent with the objective medical

evidence.

## C. Listings

Finally, Bowling argues that the evidence supports a finding that he meets the requirements of Listings 12.04, 12.06, and 12.15. Doc. 15 at 57. An individual qualifies as disabled if he meets the criteria in one of the listings of 20 C.F.R. Part 404, Subpart P, appendix 1. *See* 20 C.F.R. § 404.1525. The ALJ found that Bowling did not meet any of the listings primarily because he could not satisfy the "paragraph B" criteria. R. 13–14. For all three listings, the "paragraph B" criteria are the same:

> Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
> 1. Understand, remember, or apply information (see 12.00E1).
> 2. Interact with others (see 12.00E2).
> 3. Concentrate, persist, or maintain pace (see 12.00E3).
> 4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. Part 404, Subpart PP, Appendix 1. An extreme limitation means "[y]ou are not able to function in this area independently, appropriately, effectively, and on a sustained basis." 12.00(F)(2)(e). A marked limitation means "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 12.00(F)(2)(d).

The ALJ found that Bowling had only a moderate limitation in his ability to understand, remember, or apply information. R. 13. Bowling reported that he is able to pay bills and count change. R. 227. The ALJ also observed that Bowling was able to answer questions during the hearing without significant difficulty. R. 13. The

ALJ found that Bowling had only a moderate limitation in interacting with others. R. 13. The evidence shows that Bowling lives with his children and wife and has been a caregiver for his wife's grandparents. R. 798, 837 & 845. However, the record also indicates that Bowling has mood swings and often has angry outbursts with his family. R. 49. Bowling does attend his daughter's sporting events. R. 228. Bowling reported that he gets along well with authority figures. R. 230.

The ALJ next found that Bowling had only a moderate limitation in his ability to concentrate, persist, or maintain pace. R. 13. Again, Bowling reported that he can pay bills, use a cellphone, and play puzzle games. R. 227 & 845. He also reported picking up his children from school and practices. R. 849. Finally, the ALJ found that Bowling had only a moderate limitation in adapting or managing himself. R. 13. He reported that he grooms himself, performs household tasks, helps the children get ready for school, and cared for his wife's grandparents when they were in hospice care. R. 837 & 845. Bowling also cares for his dog. R. 227. For these reasons, there is substantial evidence in support of the ALJ's finding that Bowling has only moderate limitations in these areas and therefore does not meet the "paragraph B" criteria in Listings 12.04, 12.06, or 12.15.

## V. CONCLUSION

For these reasons, the Commissioner's decision is supported by substantial evidence and based upon the proper legal standards. Accordingly, the decision of

the Commissioner is due to be affirmed.  A final judgment will be entered separately.

DONE and ORDERED on July 16, 2021.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE